IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| FATIMA SENDEROVIC, and )<br>JASMIN AHMETOVIC, individually and )<br>For all others similarly situated, )<br>   )<br>   Plaintiffs, )<br>   )      CIVIL ACTION NUMBER:<br>v. )<br>   )      3:24-cv-01326-VAB<br>CONSUMER LEGAL GROUP PC, and )<br>   )<br>ARYEH WEBER, )<br>   )<br>   Defendants. )<br>_____) | |

**PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AND STAY**

Plaintiffs oppose Defendants' motion to dismiss and stay. *Doc. 24*. In particular, Plaintiffs note that Defendants' own motion reveals many issues of fact, several of which are exclusively within their knowledge; thus mandating discovery before any dispositive motion.

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. . . . The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Series 15-09-321 v. Hartford Financial Serv. Group,* No. 3:23-CV-1342 (VAB), 2024 WL 4871644, at *12-13 (D. Conn. Nov. 22, 2024). Pursuant to this standard, Plaintiffs' Complaint survives dismissal.

**I.   STATEMENT OF FACTS**

Plaintiffs seek damages on behalf of themselves and a class for Defendants' violations of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679b(a) by making untrue statements regarding Plaintiffs' consumer's "credit worthiness [creditworthiness], credit standing, or credit capacity to, (A) any consumer reporting agency," and "(B) any person—(i)

who has extended credit to the consumer." *Id.* They also allegedly violated CROA 15 U.S.C. § 1679b(a)(3) by sending dispute letters to credit bureaus and creditors falsely claiming that Plaintiffs' debts were invalid, when Defendants knew or had reason to know that they were valid.

The Consumer Legal Group's ("CLG") Services Agreement, in relevant part, states:

> You authorize CLG to challenge, where applicable and based on the information you provide, each of the debts listed below, which you believe and advise CLG to be in anyway invalid, inaccurate, or otherwise without a legal basis. You also authorize CLG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the resolution of debts that are excessive or otherwise unauthorized by law.
>
> . . .
>
> CLG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible.

*Doc. 24-3, p. 2*. After each instance of explaining how Defendants will assist Plaintiffs with credit repair, Defendants' form contract conveniently throws in self-serving statements like "it is expressly understood and agreed that CLG is not a credit repair organization, is not engaged in credit repair, and will not be undertaking any work as to Your credit repair[.]" "The lady doth protest too much, methinks."[1] Defendants first explain how they will be assisting Plaintiffs with credit repair, then just as quickly, disclaim what they are actually doing. These self-serving, inconsistent, and protective disclaimers should tell any trier of fact that Defendants intend to operate as a credit repair organization.

Defendants' Statement of Facts resorts to misrepresenting the allegations in the complaint. For instance, Doc. 24-1 at p. 9 misrepresents paragraph 10 of the complaint, because that paragraph says nothing about collection efforts being pending. Doc. 24-1 at p. 12 claims the

---

[1] *Hamlet, Act III, Scene II, by William Shakespeare.*

Plaintiffs do not allege that payments began before services were rendered, referencing paragraphs 15-17 of the Complaint. However, the Agreement was entered into in June (par. 13) requiring payments beginning June/July, and the services were rendered beginning in August, obviously after receipt of payment.

Elsewhere, as other examples of Defendants' misrepresentations, Doc. 24-1 at p. 20 states "However, the cease-and-desist letter cited says absolutely nothing about the debt being invalid." Defendants overlooked that very statement in their letter quoted at par. 20 of the Complaint.

Most offensive to a consumer protection attorney is the misrepresentation that "In addition, the sending of this type of cease and desist letter is standard practice for an attorney representing a consumer subject to collection efforts and is provided special protection and recourse under the Fair Debt Collections [sic] Practices Act, 15 USC 1692c(a)(2)." *Doc. 24-1 at p. 20*. Since the Fair Debt Collection Practices Act does not apply to creditors, it is not "standard practice" to send such letters to creditors. 15 U.S.C.§ 1692(a)(6). That tactic is likely to elicit a lawsuit, as happened here. (Citibank and Synchrony Bank promptly sued Jasmin Ahmetovic.)

Defendants' statement of facts itself shows the need for fact discovery. An attorney's unsworn statements are not evidence. *Puglisi v. United States* 586 F.3d 209, 217 (2d Cir. 2009) ("In writing the memorandum, counsel could not have had personal knowledge of the factual truth of the statement.") Looking at Doc. 24-1, on pages 7-9, 11-13, 18, and n.12, there are unsworn assertions of fact which Plaintiffs intend to use as the basis for discovery, most exclusively within the knowledge of Defendants, which will substantiate their status as subject to CROA. What do Defendants' records show about who made the oral representations, when payments began compared to when services began, what results/responses Defendants received from the numerous letters sent to creditors (e.g., do creditors normally stop collecting after

receiving Defendants' threats), what Connecticut attorneys have been involved in the local representation promised in the agreements, the staff involved in sending the letters and how and by whom they are paid, the background of the staff, the individual Defendant's employment or retainer agreement with the corporate Defendant, what was Defendants' distribution of the payments made by Plaintiffs, what was communicated to Defendants that led them to (mis)represent that debts were invalid,

Plaintiffs believe that Defendants are not operating a law firm, but are instead using a law firm to disguise the fact that they are a credit repair organization—a fact that will be revealed in discovery. In fact, the Defendants' motion is riddled with facts that are in the exclusive control of Defendants. Even the case cited by Defendants, *Plattner v. Edge Solutions, Inc.* 422 F. Supp. 2d 969 (N.D. Ill. 2006) was a matter decided on summary judgment, after discovery.

Further, Defendants do not have to meet the definition of a credit repair organization ("CRO") as "[t]he plain language of the CROA, however, simply prohibits *any person* from *engaging in* the proscribed activities. *Ware v. Indymac Bank, F.S.B.*, 534 F. Supp. 2d 835, 845-46 (N.D. Ill. 2008) (emphasis added); *See* 15 U.S.C. § 1679b(a)(1); *Poskin v. TD Banknorth, N.A.*, 687 F .Supp. 2d 530, 2009 U.S. Dist. LEXIS 83100 (W.D. Pa. 2009).

To state that Defendants are not attempting credit repair is ludicrous. Take for instance, the statement made in Defendants' cease and desist letters:

> I am writing to inform you that my client disputes the alleged debt and also concerning your reporting of the above-referenced account with the credit bureaus. My client believes that you are reporting false information to the credit bureaus. As a professional courtesy, I am sending this letter to try and resolve this matter before protracted and expensive litigation. On behalf of my client, I hereby demand that you provide true and accurate copies of all the documentation used to confirm the accuracy of the information you are reporting to the credit bureaus.
>
> . . .

> **Accordingly, if you have already reported this debt to any credit-reporting agency (CRA) or Credit Bureau (CB), then you must immediately inform them of my dispute with this debt.**

*Complaint Doc. 1, ¶ 20 (emphasis in original)*[2]. If that does not qualify as credit repair, Plaintiffs do not know what would.

It is indisputable that Defendants sent out letters to each of Plaintiffs' creditors disputing the debts and stating that the creditors are reporting false information to the credit reporting bureaus. *Complaint*, Doc. 1. ¶¶ 20-21. Defendants also disputed twenty (20) debts with Equifax, Experian and TransUnion in August and September 2023, despite having knowledge that the debts were valid. *Id.* at ¶¶ 22-23. Defendants state "[y]et Plaintiffs fail to allege what was ever communicated to Defendants to support that the representations were false." *Doc. 24-1 at p. 8*. In response to Defendants' dispute letters, several of the creditors sent letters to Defendants validating the debt, provided a payment history, and stated that the debts have been charged off; all of which are in Defendants' possession and subject to discovery.

Further, Defendants claim that they did not charge Plaintiffs for services before they were performed, which is patently untrue. In paragraphs 15, 16 and 17 of the Complaint, Plaintiffs stated that they were to begin paying Defendants in June and July 2023; only later, in August 2023 did the cease and desist letters begin to go out to Plaintiffs' creditors.

The Litigation Practice Group ("LPG"), a now defunct CRO, filed for bankruptcy in the Central District of California in February 2023. Prior to its bankruptcy filing, LPG sold some 6,000 consumer files to this defendant, CLG. *In Re The Litigation Practice Group,* 8:23-bk-10571-SC (Central Bankr. Cal.) Doc. 1653. The Trustee in the bankruptcy proceeding has sought to claw back double debits executed by this defendant CLG on former LPG clients.

---

[2] All such letters were signed by Defendant Aryeh Weber.

> Moreover, evidence recently obtained and submitted to this Court by the Trustee shows that CLG was associated with Tony Diab[3], Greyson Law Center, PC, Han Trinh[4] and Jayde Trinh[5] among others. Their stated goal was to "kill" LPG, contrary to CLG's representations in its Opposition. By way of example, Tony Diab and Han Trinh trained Sam Geiger and Jason Rebhun, among others at CLG, on LPG's business practices following LPG's transfer of client files to CLG. Like Phoenix, CLG was using LPG's attorney network, misappropriated by Greyson, and paying Greyson an exorbitant fee for doing so. Moreover, the evidence shows CLG was the source of double debits initiated on fraudulently transferred LPG client files. CLG refused to provide refunds to these customers.
>
> CLG admits it was the recipient of former LPG client files transferred pre-petition.

*Id.* Thus, CLG is no stranger to credit repair, as it has been trained by a known CRO.

> CLG previously stated the following on its website:
>
> **Are any of the below applicable to you?**
>
> - Have creditors harassed you at your home or place of work or served you with legal paperwork or a lawsuit?
>
> - Was your car or personal property repossessed?
>
> - *Has your credit score been affected negatively?*
>
> - Was your family threatened with the loss of your home or other assets?
>
> - Were you denied employment because of your financial difficulties?
>
> - Was your physical safety threatened by creditors on account of non-payment?
>
> If any of the above applies to you, you might have a potential legal claim. Contact us to determine if litigation is the right solution.

---

[3] Diab is a disbarred attorney at the head of LPG.

[4] Former administrator at LPG who left LPG for Greyson Law Center PC.

[5] Former administrator at LPG who left LPG for Greyson Law Center PC.

https://web.archive.org/web/20230601050040/https://consumerlegalgroup.com/ (last visited Nov. 27, 2024) (Bold in original, underlining and italics added.)

## II. ARGUMENT AND CITATIONS OF AUTHORITY

It seems indisputable, to be confirmed by discovery, that Defendants are a CRO. As 15 U.S.C. § 1679a provides:

> (3) Credit repair organization. The term "credit repair organization"—
>
> > (A) means any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—
> >
> > > (i) improving any consumer's credit record, credit history, or credit rating; or
> > >
> > > (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i);

*Id.* The language used in Defendants' cease and desist letters makes this crystal clear: "I am writing to inform you that my client disputes the alleged debt and also concerning your reporting of the above-referenced account with the credit bureaus." *Complaint, Doc. 1 ¶ 20.* There can be no doubt that Defendants were attempting to "improv[e] [a] consumer's credit record, credit history or credit rating[.]" 15 U.S.C. § 1679a(3)(A)(i).

Defendants' citation to *Cortese v. Edge Sols., Inc.*, 2007 WL 2782750, (E.D.N.Y. 2007) is of no help to Defendants. In *Cortese,* the court expressly declined to follow *Plattner,* and in declining to grant defendant's motion for summary judgment, held:

> The Agreement signed by Plaintiff describes the purpose of the Post Closing Credit Restoration Program as "to assure that your credit reports properly reflect the settlement and paid accounts that involved this program." The letter entitled "How The Debt Melt

> Down Program Work's," states, however, in an apparent reference to the Post Closing Program, that "[u]pon completion of the program, Edge will work with you for 12 months in a best effort rehabilitation of your credit rating."
>
> In discussing whether the Post Closing Credit Restoration Program brings Edge within CROA's definition of credit repair organization, it is important to reiterate that the definition covers implied as well as express representations of "improving any consumer's credit record, credit history, or credit rating;" or "providing advice or assistance to any consumer with regard to" improving their credit record, credit history or credit rating." At the very least, the Post Closing Program implies it will improve the client's credit record, credit history or credit rating.

*Id.* at *6.*[6]* In *Stout v. FreeScore, LLC*, 743 F.3d 680, 687–88 (9th Cir. 2014), the Ninth Circuit Court of Appeals refused to follow both *Plattner* and *Hillis v. Equifax Consumer Servs., Inc.*, 237 F.R.D. 491 (N.D. Ga. 2006) and stated:

> FreeScore points to two other decisions to argue that the definition of "credit repair organization" does not encompass entities that provide credit information so consumers can improve their own credit. *See Hillis v. Equifax Consumer Servs., Inc.,* 237 F.R.D. 491 (N.D. Ga. 2006); *Plattner v. Edge Solutions, Inc.,* 422 F.Supp.2d 969 (N.D. Ill. 2006). We believe that the plain language of the CROA is at odds with those decisions. *See, e.g., Zimmerman,* 613 F.3d at 72 n. 14 ("The theory put forward by the district court in *Hillis* appears to be an outlier."); *Reynolds v. Credit Solutions, Inc.,* 541 F.Supp.2d 1248, 1255 (N.D. Al. 2008), *vacated on other grounds Picard v. Credit Solutions, Inc.,* 564 F.3d 1249 (11th Cir. 2009) ("This court respectfully declines to follow whatever relevant guidance is offered by *Plattner* and *Hillis* because they both stray from the plain language of CROA.").

*See also Day v. Persels & Assoc. LLC*, 2015 U.S. Dist. LEXIS 11447 (M.D. Fla. 2015) (rejecting *Hillis* and *Plattner,* and following *Zimmerman* and *Stout*). "In sum, the law firm defendants' offering of debt management services does not mean that they cannot be held liable under the CROA." *Id. at *49.*

---

[6] It should be noted that *Cortese* was also decided *after* discovery was conducted.

In *Walston v. Nationwide Credit, Inc.,* 2019 WL 4139002 (N.D. Ill. 2019) relied on by Defendants, the plaintiff sued a debt collector under CROA for attempting to collect a debt for American Express. The primary holding was that the debt collector was working for American Express, not the plaintiff, and therefore had not been paid for credit repair services by the plaintiff. "Nationwide was providing a service to American Express, not to Walston; that service, and Nationwide's focus, was debt collection for American Express as a creditor, not credit repair for Walston as a debtor." *Id. at *4.* Here, unlike in *Walston*, Plaintiffs paid Defendants for credit repair, and not only did Defendants perform credit repair services, they accepted payment *prior to* performing their attempts at credit repair.

"Yet there is a fine line, in advertising and soliciting for credit counseling services to an unsophisticated audience of lower-income debtors, between promising future rewards for creditworthiness, and implying that existing bad credit records may be prematurely expunged." *Limpert v. Cambridge Credit Counseling Corp.*, 328 F. Supp. 2d 360, 364 (E.D.N.Y. 2004), *amended on reconsideration in part,* 2004 WL 3395347 (E.D.N.Y. Sept. 16, 2004). "[T]he *Limpert* court found it could not resolve the status of the defendants before it (who are also parties to this litigation) at the motion to dismiss stage, stating that this mere theoretical distinction between credit counseling and credit repair was 'not decisive in finding whether a credit counseling agency may be held liable under the CROA.' *Id.* at 365." *Zimmerman v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 275 (D. Mass. 2008), aff'd sub nom. *Zimmerman v. Puccio*, 613 F.3d 60 (1st Cir. 2010).

Regarding self-serving disclaimers leaned on so heavily by Defendants (*Doc 24-1 p. 14*), the court in *F.T.C. v. Gill*, 71 F. Supp. 2d 1030, 1044 (C.D. Cal. 1999), aff'd, 265 F.3d 944 (9th Cir. 2001), stated:

> [The Defendants] point to the disclaimer provided in their contract, the fact that they never guaranteed anything to anyone, and that they never represented that the removal of negative information would be permanent. The Court first addresses the disclaimer issue. First, the disclaimer is not included in the representations. It is found on the contract that consumers eventually sign with the defendant. Therefore, because each representation must stand on its own merit, even if other representations contain accurate, non-deceptive information, that argument fails. *See Removatron Int'l Corp. v. FTC,* 884 F.2d 1489, 1496–97 (1st Cir. 1989). Second, a disclaimer does not automatically exonerate deceptive activities. *See In re Rexplore Securities Litigation,* 671 F.Supp. 679, 683–85 (N.D.Cal. 1987).

Regarding Defendants' argument that New York law exempts attorneys from being defined as a credit service business[7], and that the Agreement is governed by New York law, Plaintiffs again point to their information and belief that Defendants are operating a CRO and disguising it as a law firm—a fact that Plaintiffs will substantiate from discovery.

Defendants contend that Plaintiffs' statement that they were "pitched to participate in a debt validation program where 'all' of her debt would be removed from her credit report" but that Defendants did almost nothing to make that happen (Compl., ¶ 12, 31)" is precluded by a merger clause in the Services Agreement. *Doc 24-1 at pp. 20, 22.* Defendants are wrong. "[T]he merger clause does not make [Plaintiffs'] reliance on defendants' misrepresentations unreasonable as a matter of law because it is only a "general" merger clause, as opposed to a specific disclaimer. *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019). As the Second Circuit as held repeatedly, "the issue of reasonable reliance requires that we consider "the entire context of the transaction, including . . . its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Id. at 141. See Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 330–31 (2d Cir. 2002) ("general disclaimers

---

7    Citing NY GBL § 458-b

are insufficient to defeat reasonable reliance on material misrepresentations as a matter of law, even by a sophisticated party.")

### III. NO STAY OF DISCOVERY SHOULD ISSUE

Defendants request a stay of discovery while their motion to dismiss is pending, pursuant to Fed. R. Civ. P § 26(c). Such a stay is contrary to the norm of "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. § 1. It is also directly contrary to the Standing Order on Pretrial Deadlines (Doc. 3), which specifies: "(b) The filing of a motion to dismiss shall not result in a stay of discovery or extend the time for completing discovery."

"Discovery is not normally stayed during the pendency of a motion to dismiss, absent a showing of good cause." *Briscoe v. City of New Haven*, 2009 WL 5184357 at *3 (D. Conn. 2009); *see United States v. Board of Educ. of City of Chicago*, 636 F. Supp. 1046, 1047 (N.D. Ill. 1986) (denying motion to suspend discovery <u>because motions to dismiss are usually denied</u>).

Moreover, the one-paragraph request (*Doc. 24-1 at p 24*) does not comply with Rule 26(c).[8] It is not in the form of a motion for protective order; it does not include a certification as to a good faith conference; it does not invoke any basis for the Court to issue a stay under that rule, which is "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense"; and does not satisfy the tripartite standard of the case they rely on,

---

[8] (c) Protective Orders.

(1) *In General.* A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending—or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(A) forbidding the disclosure or discovery; . . .

*United States ex rel. Ameti v. Sikorsky Aircraft Corp.*, No. 3:14-CV 1223 (VLB), 2016 WL 10490528, at *2 (D. Conn. Nov. 28, 2016).

Since Defendants did not, and cannot, claim "annoyance, embarrassment, oppression, or undue burden or expense," their request for a stay of discovery should be denied. Since the Defendants did not assert two of the three essential elements for a stay, "the potential burden of producing discovery and the lack of evidence that [plaintiff] will be unduly prejudiced by a stay," their request for a stay of discovery should be denied.

Defendants cursorily asserted "the demonstrated futility" of Plaintiffs' claims. But, as shown above, and shown by Defendants' own motion, Plaintiffs' claims are substantively valid. The discovery proposed above is routine paper discovery, readily available to Defendants and largely exclusively in their hands.

The defective and unsubstantiated motion for stay of discovery should be denied.

## IV.  CONCLUSION

For the foregoing facts, reasons, arguments and citations of authority, Plaintiffs respectfully request that this Honorable Court DENY Defendants' motion to dismiss as well as its motion to stay discovery.

Respectfully submitted, this 2nd day of December, 2024.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104
Admitted pro hac vice

1551 Jennings Mill Road
Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile:  706-996-2576
jhurt@hurtstolz.com

|  |  |
|---|---|
|  | **ERIC LINDH FOSTER LAW, LLC** |
|  | /s/  Eric L. Foster |
|  | By: Eric L. Foster, Esq. |
|  | Juris No.: ct29740 |
| 48 Main Street |  |
| Old Saybrook, CT 06475 |  |
| Tel: (203) 533-4321 |  |
| Fax: (203) 738-1024 |  |
| efoster@lindhfoster.com | **ATTORNEYS FOR PLAINTIFFS AND THE PUTATIVE CLASS** |

**CERTIFICATE OF SERVICE**

I hereby certify that on December 2, 2024, a copy of the foregoing Response in Opposition to Defendants' Motion to Dismiss and to Stay Discovery was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.

Parties may access this filing through the Court's CM/ECF System.

Respectfully submitted, this 2nd day of December, 2024.

                                                        **HURT STOLZ, P.C.**

                                                    /s/ James W. Hurt, Jr.
                                                    By: James W. Hurt, Jr.
                                                    Georgia Bar No.: 380104

1551 Jennings Mill Road
Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile: 706-996-2576
jhurt@hurtstolz.com                     **ATTORNEY FOR PLAINTIFFS AND THE PUTATIVE CLASS**